UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

DIANNA ANGELO,

        Plaintiff,

v.

MILE HIGH AMBULANCE, LLC, a Colorado limited liability company,

        Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, Dianna Angelo, by and through her attorneys, HKM Employment Attorneys, LLP, for her Complaint against Mile High Ambulance, LLC ("Defendant" or the "Company") states and alleges as follows:

### PRELIMINARY STATEMENT

1. This is an employment discrimination case arising from Defendant's discrimination toward and wrongful termination of Plaintiff because Plaintiff suffers from one or more disabilities and/or perceived disabilities within the meaning of the Americans with Disabilities Act and/or because of Plaintiff's age, in violation of the Age Discrimination in Employment Act. In addition, Defendant punished or otherwise retaliated against Plaintiff for making a good faith report regarding a practice, procedure, action and/or failure to act with regard to patient safety; thus, Defendant wrongfully terminated Plaintiff in violation of clear public policy.

## PARTIES

2. Plaintiff is, and at all times relevant to this Complaint was, a resident of Colorado. At all relevant times, Plaintiff was a member of a protected class of individuals recognized under the ADA and ADEA.

3. Defendant, Mile High Ambulance, LLC, is a Colorado limited liability company. Plaintiff worked for the Defendant at its principal office, located at 8451 Brighton Road, Commerce City, Colorado 80022.  At all relevant times, Defendant was an "employer" within the meaning of the ADA and ADEA.

4. Defendant is an employer within the meaning of 42 U.S.C. § 12111(5)(A), in that it has 15 or more employees each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

## JURISDICTION AND VENUE

5. Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

6. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367 because Plaintiff's state law claim is so related to the claims in the actin within original jurisdiction that they form part of the same case or controversy.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in this District.

## ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

8. Plaintiff incorporates by reference the above paragraphs as though set forth

separately herein.

9. Plaintiff filed her Charge of Discrimination, Numbers FE2019369840 and 32A-2019-00344, with the Equal Employment Opportunity Commission and Colorado Civil Rights Division for age, disability, and/or perceived disability discrimination on or about February 22, 2019. Plaintiff was issued a Notice of Right to Sue with respect to Charge Number FE2019369840 on February 3, 2019 and was issued a Notice of Right to Sue regarding Charge Number 32A-2019-00344 on or around April 9, 2020. Plaintiff filed the present action within ninety (90) days of receipt of the first Notice of Right to Sue.

10. Plaintiff has met all administrative prerequisites prior to filing this action.

## FACTUAL ALLEGATIONS

11. Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

Facts Related to Plaintiff's Background

12. Plaintiff began working for Defendant as an Ambulance Dispatcher in September 2017.

13. Plaintiff resigned from working for Defendant on or around May 5, 2018 to work for a different company and was rehired to again work as an Ambulance Dispatcher for Defendant approximately three months later, in or around August 2018.

14. As an Ambulance Dispatcher, Plaintiff's responsibilities included:

   a. Dispatching ambulances to scheduled calls to ensure appropriate medical level of transport care to area facilities; and

   b. Efficiently posting and dispatching vehicles to emergency and non-emergency

calls in a timely manner.

15. As an Ambulance Dispatcher, Plaintiff was expected to have advanced knowledge of emergency medical services policies, procedures, and protocols. She was also expected to have knowledge of current methods, principles, and techniques in delivering emergency medical dispatching.

16. Plaintiff has a disability (diabetes) under the Americans with Disabilities Act.

17. Plaintiff is 63 years old and thus is of a protected class under the Age Discrimination in Employment Act.

Facts Related to Defendant's Background

18. Defendant offers emergency, non-emergency, and inter-facility ambulance services to health care facilities and individuals.

19. All of Defendant's paramedics and Emergency Medical Technicians are fully licensed and certified in the state of Colorado.

20. Defendant asserts on its website that: "Patient care is our number one priority." *See:* www.milehighambulance.com/about/.

21. Defendant offers services throughout the Denver metro area, Colorado Springs, Northern Colorado, and the Front Range area ("Service Area").

22. Defendant enters into contracts to provide transportation to and from multiple medical providers within the Service Area.

23. Defendant is Rose Medical Center's primary ambulance provider. Defendant serves Rose Medical Center's free-standing Emergency Department at Stapleton, and Defendant is also a back-up provider for Swedish Medical Center and Swedish Medical Center at Belmar.

24. Some or all of the contracts between Defendant and service providers dictate that – if Defendant accepts a vehicle request – then the vehicle must be at the designated location within a requisite period of time.

25. Defendant is licensed as an EMT with the Emergency Medical and Trauma Services Branch of the Colorado Department of Public Health and Environment, license number 1827.

Facts Related to Discrimination and Wrongful Termination

26. At all relevant times, Defendant acted or failed to act by and through the conduct of its managers, supervisors, agents, and employees, all acting within the scope and course of their employment.

27. In or around November 2018, Connie David (Human Resources) called Plaintiff into her office.

28. Ms. David was new to working for Defendant and when she asked Plaintiff to her office in November 2018, she questioned Plaintiff about what Plaintiff would change about Defendant, if she had the opportunity to do so.

29. Plaintiff explained that there was one primary item she would change: she would try to improve employee retention, because the Defendant had very high employee turnover.

30. When asked how she would improve employee turnover, Plaintiff explained to Ms. David that the Defendant should provide better medical benefits. She elaborated that this would be very helpful for employee retention, and for Plaintiff specifically because she is a Type 1 Diabetic.

31. Ms. David responded: "You are a diabetic? You can't work nights by yourself!

You could space out!"

32. Plaintiff told Ms. David that she has been a diabetic for sixty years and is familiar with her medical needs, explaining that she brings food with her to work and can always fix a drop in her blood sugar.

33. Ms. David responded: "Well my sister is a Type 1 diabetic and she spaces out."

34. As soon as Plaintiff told Ms. David that she has diabetes, Ms. David questioned Plaintiff's judgment regarding a prior order (i.e. request for an emergency vehicle) which Plaintiff had cancelled due to the only available ambulance having a flat tire. Plaintiff explained that she was complying with contractual and statutory requirements in cancelling the order, as it would have been dishonest, unsafe, and unlawful for her to accept a request for an ambulance when none was available within the requisite time frame.

35. Following the conversation with Ms. David, Defendant's management team began to treat Plaintiff differently and seemed intent on forcing Plaintiff out of her employment due to her disability, perceived disability, and/or age.

36. After Plaintiff informed Ms. David of her diabetes, Plaintiff's supervisors began scrutinizing her work very closely and demonstrating frustration with her when she did her normal job duties. For example, it was common practice among the Defendant's employees to turn down emergency calls when no ambulances are available within the designated response time. However, the Defendant began to question and second-guess Plaintiff anytime that she turned down a call, despite allowing other dispatchers to reject calls when appropriate and/or required.

37. On one occasion, Plaintiff turned down an emergency call from Falck Rocky Mountain Ambulance ("Falck") because Defendant had no ambulances available to be at the

response location within twenty (20) minutes, and Falck had said that an ambulance must arrive within twenty minutes. Also, Falck requested the ambulance be sent to Longmont, which is outside the bounds of Defendant's permissible service area. It would have been very dangerous for Plaintiff to agree to send an ambulance when there was not one available within the designated time frame – i.e. if Plaintiff had agreed to send an ambulance, knowing that Defendant had none available, then a person who was in an emergency situation could have been left waiting for a dangerous and potentially life-threatening amount of time.

    a. To further patient safety, and because the response location was in an area in which Defendant did not normally service, Plaintiff turned down the request.

    b. Plaintiff was verbally reprimanded for rejecting the call, despite her being legally and ethically obligated to do so.

38. On another occasion, Plaintiff attempted to fulfill a request for an ambulance to Rose Medical Center. When she contacted the paramedic in charge of the on-duty ambulance, the paramedic stated that the Defendant could not service the request because the on-duty ambulance had a flat tire. The paramedic specifically asked Plaintiff to inform Rose Medical Center of the situation. Plaintiff informed Rose Medical Center that she could not send an ambulance, as it was not in service yet.

    a. Upon information and belief, Defendant's contract with Rose Medical Center requires Defendant's ambulances to be at Rose Medical Center within thirty (30) minutes of the request, when Defendant says it is able to provide an ambulance.

    b. In this instance, so as not to violate the contract between Defendant and Rose

> Medical Center – and because the paramedic said Defendant could not be there within that time – Plaintiff informed Rose Medical Center that the Defendant could not handle the request.

39. On or around November 27, 2018, Defendant held a dispatch meeting in which it instructed dispatchers to fill *all* requests for transportation.

   a. Instead of acknowledging that dispatchers should refuse requests when no ambulances were available, and/or when it would put the potential patient at risk due to Defendant's anticipated response time, Defendant instructed dispatchers that they *must* accept and attempt to fill *all* requests for transport.

40. On or around November 30, 2018, Plaintiff was terminated.

41. Upon information and belief, Plaintiff was replaced by Bonnie Sinjem who, to her knowledge, has no known disability and/or perceived disability and is significantly younger than the Plaintiff.

42. Upon information and belief, Bonnie Sinjem also had not reported concerns about any unethical or illegal behavior by Defendant.

43. Upon information and belief, Defendant likewise terminated other employees who were of Plaintiff's protected classes – i.e. employees who had disabilities and/or perceived disabilities and/or who were over 40 years old.

## FIRST CLAIM FOR RELIEF
**(Disability Discrimination in Violation of Section 102(a) of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12112(a))**

44. Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

45. Plaintiff is a disabled person within the meaning of the ADA.

46. Plaintiff suffers from type 1 diabetes.

47. Type I diabetes and/or the symptoms directly related to the condition physical or substantially limits one or more major life activities.

48. Plaintiff was qualified for her job and capable of performing the essential functions of her position with or without a reasonable accommodation.

49. Plaintiff was regarded as being disabled by Defendant.

50. Beginning in or around November 2018, and up until her termination on November 30, 2018, Defendant discriminated against Plaintiff because of her disabilities by subjecting her to less favorable terms, conditions, and privileges of employment than employees outside of Plaintiff's protected class, and by scolding Plaintiff for properly executing her job duties.

51. On or around November 30, 2018, Defendant discriminated against Plaintiff because of her disabilities by terminating her employment because of Plaintiff's disabilities and/or perceived disabilities, in violation of the ADA.

52. Plaintiff's disability and/or perceived disability was a motivating factor in the Defendant's decision to terminate Plaintiff.

53. The effect of Defendant's discriminatory practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of Plaintiff's disabilities and/or perceived disabilities.

54. Defendant's above-described conduct was intentional.

55. Defendant's above-described conduct was done with malice or reckless indifference to Plaintiff's federally-protected rights.

56.     As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

### SECOND CLAIM FOR RELIEF
### (Age Discrimination in Violation of the Age Discrimination in Employment Act of 1967, ("ADEA"))

57.     Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

58.     At all times relevant to this case, Plaintiff has been at least 40 years of age and therefore protected by the ADEA, 29 U.S.C. §§ 621 – 634.

59.     At all times relevant to this case, Defendant was an "employer" within the meaning of the ADEA, 29 U.S.C. § 630(b).

60.     Defendant discriminated against Plaintiff because of her age by subjecting her to less favorable terms, conditions, and privileges of employment than younger employees, and by scolding Plaintiff for properly executing her job duties.

   a. For example, younger employees frequently rejected calls and were not reprimanded for doing so, whereas Plaintiff was scolded for the same conduct.

61.     The Defendant would not have reprimanded and terminated Plaintiff but for Plaintiff's age.

62.     Although Plaintiff at all relevant times successfully performed her job, she was terminated because of her age and replaced by a younger employee.

63.     Based on the above-described acts, practices, and omissions, the Defendant

engaged in unlawful discrimination under the ADEA based on Plaintiff's age.

64. Defendant's above-described conduct was intentional and was motivated by Plaintiff's age.

65. Defendant knowingly and willfully engaged in the above-described conduct and discriminatory termination of Plaintiff on the basis of her age.

66. As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits; and she is entitled to such general and special damages, economic damages, liquidated damages, and attorneys' fees and costs as permitted by law.

## THIRD CLAIM FOR RELIEF
### (Wrongful Termination in Violation of Public Policy)

67. Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

68. During the course of her employment with Defendant, and specifically in November 2018, Plaintiff internally reported and raised concerns regarding what she reasonably believed to be violations of Defendant's statutory, regulatory, contractual, and ethical duties and obligations.

69. Further, Plaintiff believed that booking an ambulance when none was actually available was a wrongful or criminal deception that would lead to financial gain for Defendants but may cause harm to the person needing the ambulance.

70. Defendant punished or otherwise retaliated against Plaintiff for making a good faith report regarding a practice, procedure, action and/or failure to act with regard to patient safety.

71. The essence of the public-policy exception to at-will employment status is that an

employee has a cognizable claim for wrongful discharge where the discharge contravenes a clear mandate of public policy. *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 107 (Colo. 1992).

72. Claims for wrongful discharge under Colorado's public-policy exception have included termination of an employee for (1) refusal to participate in illegal activity; (2) the employee's refusal to forsake the performance of an important public duty or obligation; (3) the employee's refusal to forego the exercise of a job-related legal right or privilege; (4) the employee's whistleblowing activity or other conduct exposing the employer's wrongdoing; and (5) the employee's performance of an act that public policy would encourage under circumstances where retaliatory discharge is supported by evidence of employer's bad faith, malice, or retaliation. *Id.*

73. An at-will employee will establish a *prima facie* case for wrongful discharge under Colorado's public-policy exception if the employee presents evidence on the following elements: (1) that the employer directed the employee to perform an illegal act as part of the employee's work-related duties or prohibited the employee from performing a public duty or exercising an important job-related right or privilege; (2) that the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker; (3) and that the employee was terminated as a result of refusing to perform the act directed by the employer and/or for exercising a public duty or job-related right or privilege. *Id.* at 109.

74. Public policy must be clearly mandated such that the acceptable behavior is concrete and discernible, as opposed to a broad hortatory statement of policy that gives little

direction as to the bounds of proper behavior. *Rocky Mountain Hosp. & Medical Service v. Mariani*, 916 P.2d 519, 525 (Colo. 1996). Statutes by their nature are the most reasonable and common sources for defining public policy. *Id.*

75. The Colorado Supreme Court has acknowledged that "[a] professional employee forced to choose between violating his or her ethical obligations or being terminated is placed in an intolerable position." *Mariani*, 916 P.2d at 524.

### Sources Establishing Public Policy

76. Plaintiff's termination was unlawful and violates public policy because she was terminated for making good faith reports regarding compliance with state laws enacted to promote patient safety, and because she was terminated for refusing to engage in acts directed by Defendant that would violate statutes, regulations, and contracts relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker.

77. On numerous occasions, Plaintiff insisted that the Defendant was legally bound to say that it could not provide emergency transport as requested.

78. Plaintiff was terminated in retaliation for her good faith reports and conduct.

### Health Care Workers – Retaliation Prohibited

79. C.R.S. § 8-2-123(2)(a) provides that: "A healthcare provider shall not take disciplinary action against a health care worker in retaliation for making a good faith report or disclosure." A "good faith report or disclosure" is defined in C.R.S. § 8-2-123(1)(b) as:

> "[A] report regarding patient safety information or quality of patient care that is made without malice or consideration of personal benefit and that the health care worker making the report has reasonable cause to believe is true. 'Good faith report or disclosure' also

>includes, with respect to patient care, a report regarding any practice, procedure, action, or failure to act with regard to patient safety that concerns information regarding a generally accepted standard of care; a law, rule, regulation, or declaratory ruling adopted pursuant to law; or compliance with a professional licensure requirement, which report is made without malice or consideration of personal benefit and that the health care worker making the report has reasonable cause to believe is true."

80. "Health care worker" includes emergency medical service providers licensed under C.R.S. § 25-3.5-203.  C.R.S. § 25-3.5-123(1)(d).

81. Plaintiff is a health care worker under § 8-2-123.

82. "Health care provider" is defined as "any health care facility licensed under section 25-3-101, C.R.S., or any individual who is authorized to practice some component of the healing arts by license, certificate, or registration."  C.R.S. § 25-3.5-123(1)(c).

83. Defendant is a health care provider under C.R.S. § 8-2-123.

84. Defendant retaliated against Plaintiff for making good faith reports, in violation of C.R.S. § 8-2-123(2)(a).

### Emergency Medical Service Providers – Decline Patient Who is Beyond Responders' Capabilities

85. The Colorado Department of Public Health and Environment's Health Facilities and Emergency Medical Services Division has promulgated regulations pertaining to emergency medical services.  *See* 6 Code Colo. Regs. § 1015-3 ("EMS Rules").

86. Under the EMS Rules, "The transporting EMS provider may decline to transport any patient he or she believes requires a level of care beyond his or her capabilities."  6 Code Colo. Regs. § 1015-3, at 15.2.

87. Per the EMS Rules, "The EMS medical director shall have protocols in place to

ensure the appropriate level of care is available during interfacility transport." 6 Code Colo. Regs. § 1015-3, at 15.1.

88. Under the EMS Rules, "A P-CC may decline transport of any patient that requires a level of care outside of their defined scope of practice or that the P-CC believes is beyond their capabilities." 6 Code Colo. Regs. § 1015-3, at 16.2.

89. A Medical Director shall: "Have protocols in place to ensure the appropriate level of care is available during critical care transport. The capabilities of the transporting agency and the safety of the patient should be considered when making transport decisions." 6 Code Colo. Regs. § 1015-3, at 16.3.3.

90. Plaintiff spoke up to Defendant when she was asked to violate these provisions by agreeing to provide ambulance services when Defendant had no available ambulances with the requisite capabilities, and when the paramedic on duty indicated that he could not respond to the emergency situation.

<u>Emergency Medical Service Providers – Must Meet Criteria Regarding Response Times</u>

91. Under 6 Code Colo. Regs. § 1015-4, at 202, first response units and ambulance services must meet certain criteria, including that emergency response times for ground transport agencies must comply with the following required response times:

   a. In high density areas (metropolitan), in which the provider service area encompasses 100,000 people or more, the response time must be within 11 minutes 90% of the time;

   b. In mid-density areas (urban or mixed), in which the provider service area encompasses 12,000 to 100,000 people, the response time must be within 20

        minutes 90% of the time; and

      c. In low-density areas (rural, frontier), in which the provider service area encompasses less than 12,000 people, the response time must be within 45 minutes 90% of the time.

92. Under the Mile-High Regional Emergency Medical and Trauma Advisory Council's Inter-facility Transfer Guidelines and Algorithm, the following must be considered for safe transfer of a patient:

      a. Availability of appropriate transfer staff;

      b. Presence of adverse weather conditions, road closures, construction, traffic delays or other hazards on transfer route;

      c. Time of day and influence on transfer crew, wildlife activity or other factors; and

      d. Potential for patient condition to deteriorate and ability to provide foreseeable treatments in transfer vehicle.

93. Under the Mile-High Regional Emergency Medical and Trauma Advisory Council's Inter-facility Transfer Guidelines and Algorithm, the following must be considered by the ambulance supervisor or local agency appropriate other entity:

      a. Therapies within scope of practice of available crew/possible alternative therapies;

      b. Comfort level of ambulance personnel with specific patient;

      c. Availability of other units or time required to backfill, or place staff, and provide 911 coverage while transfer unit is out of service area;

      d. Availability of suitable transfer vehicle with inverter or other special equipment and adequate payload to accommodate additional crew;

      e. Presence of adverse conditions or other hazards on transfer route; and

      f. Transfer priority (immediate, urgent, schedule; an immediate priority inter-facility transfer has the same priority as a 911 call).

94. When Plaintiff insisted that the Defendant comply with the above provisions, the Defendant retaliated against her by verbally reprimanding her and then terminating her employment.

<u>Emergency Medical Service Providers – Can Only Provide Services in Which Ambulance Company is Licensed</u>

95. Under C.R.S. § 25-3.5.301(1), "no person shall provide ambulance service publicly or privately in this state unless that person holds a valid license to do so issued by the board of county commissioners of the county in which the ambulance service is based, except as provided in subsection (5) of this section."

96. Upon information and belief, Longmont, Colorado was outside of Defendant's service area during the pertinent time period.

97. When the agency finds a licensee – such as Defendant – "guilty of deliberate and willful violation or that the public health, safety, or welfare imperatively requires emergency action and incorporates the findings in its order, it may suspend the license pending proceedings for suspension or revocation which shall be promptly instituted and determined." C.R.S. § 24-4-104(4)(a).

98. Further: "Any person who violates any provision of this part 3 commits a class 3 misdemeanor and shall be punished as provided in section 18-1.3-501, C.R.S." C.R.S. § 25-3.5-

306.

99. When Plaintiff turned down a transport to Longmont – in compliance with the statutes above, in order to help preserve Defendant's license, and so as not to commit a criminal offense – Defendant scolded and terminated Plaintiff in retaliation.

100. In addition, to the extent booking an ambulance would have called for Plaintiff to participate in deceiving an entity or person that an ambulance was available when one was not actually available, termination or retaliation against Plaintiff for any failure to participate in that activity (i.e. fraud) is an additional violation of public policy.

### Application: Angelo's Reporting

101. Plaintiff objected to illegal practices and then, in some instances, by inaction declined to participate in said illegal practices.

102. Plaintiff's reports regarding patient safety were made without malice or consideration of personal benefit.

103. Plaintiff had reasonable cause to believe the circumstances supporting her reports was true.

104. Plaintiff's good faith reports were made in accordance with the internal procedures of Defendant and/or Defendant's contracts with health care providers.

105. Defendant retaliated against Plaintiff for making such good faith reports regarding patient safety and compliance.

106. Defendant was aware, or should have been aware, that Plaintiff reasonably believed she was voicing her concerns and making internal reports pursuant to a duty or right detailed in clear public policy.

107. Plaintiff's internal reports and complaints were actions taken in an effort to stop violations of clear public policy, actions taken in performance of a public duty relating to Plaintiff's basic responsibility as a citizen of the United States and Colorado, and actions taken as an exercise of her work-related rights.

108. Following Plaintiff's reports, Plaintiff was subjected to retaliatory disciplinary action when Defendant terminated Plaintiff.

109. Defendant discharged Plaintiff because Plaintiff followed the law and because she performed her duties as an Ambulance Dispatcher.

110. Defendant's above-described conduct was willful and wanton and attended by circumstances of malice and reckless disregard for the rights of Plaintiff.

111. As a result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience, and she is entitled to such general and special damages, economic damages, and garden variety emotional distress damages as permitted by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor against Defendant and order the following relief as allowed by law:

A. Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, garden-variety emotional distress, pain, inconvenience, mental anguish, and loss of enjoyment of life;

B. Punitive damages as allowed by law;

C. Liquidated damages as allowed by law;

  D. Attorneys' fees and costs of this action;

  E. Pre-judgment and post-judgment interest at the highest lawful rate; and

  F. Such further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted this 1st day of May 2020.

        **HKM EMPLOYMENT ATTORNEYS LLP**

      By: *s/ Jesse K. Fishman*
        Jesse K. Fishman (44807)
        Claire E. Hunter (39504)
        HKM Employment Attorneys LLP
        730 17th Street, Suite 750
        Denver, Colorado 80202
        Telephone: (720) 668-8989
        jfishman@hkm.com
        chunter@hkm.com
        *Attorneys for Plaintiff Dianna Angelo*

Plaintiff's Address:

1201 W. Thornton Parkway, #36
Thornton, CO 80260